# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

JOHN DAMRON,            )
                             )
     **Plaintiff,**         )
                             )
   **v.**                    )     **CAUSE NO. 1:13-CV-00234**
                             )
CAROLYN W. COLVIN,      )
**Acting Commissioner of Social Security,**  )
                             )
     **Defendant.**        )

## OPINION AND ORDER

Plaintiff John Damron appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner"), denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Damron applied for DIB in January 2011, alleging disability as of October 14, 2002. (Tr. 105-06.) He was last insured for DIB on December 31, 2008 (Tr. 45); therefore, he must establish that he was disabled as of that date. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that a claimant must establish that he was disabled as of his date last insured in order to recover DIB benefits).

The Commissioner denied his application initially and upon reconsideration, and Damron requested an administrative hearing. (Tr. 45-47, 50-53, 60-61.) On April 19, 2012, a hearing was

---

[1] All parties have consented to the Magistrate Judge. (Docket # 15); *see* 28 U.S.C. § 636(c).

conducted by Administrative Law Judge ("ALJ") Yvonne Stam, at which Damron, who was represented by counsel, and a vocational expert testified. (Tr. 25-44.) On May 16, 2012, the ALJ rendered an unfavorable decision to Damron, concluding that he was not disabled because despite the limitations caused by his impairment, he could perform a significant number of light, unskilled jobs in the national economy. (Tr. 9-17.) The Appeals Council denied Damron's request for review, at which point the ALJ's decision became the final decision of the Commissioner. (Tr. 1-4.)

Damron filed a complaint with this Court on August 12, 2013, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, Damron argues that: (1) the residual functional capacity ("RFC") assigned by the ALJ is not supported by substantial evidence; and (2) the ALJ failed to adequately consider the effect of Damron's obesity. (Social Security Opening Br. of Pl. 8-15.)

## II. FACTUAL BACKGROUND[2]

### A. Background

On his date last insured, Damron was fifty years old (Tr. 105); had a high school education and training in real estate sales, auctioneering, and as a broker (Tr. 145-46); and had worked at Dana Corporation for more than twenty-five years as a machinist (Tr. 146, 321). Damron alleged in his DIB application that he became disabled because of a left shoulder injury, diabetes, and depression. (Tr. 144.)

At the hearing, Damron testified that other than serving on the town council in 2008, he has not worked since going on permanent disability through his employer in October 2002. (Tr.

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 852-page administrative record necessary to the decision.

28-29, 32, 35.)  He stated that his health steadily declined after his alleged onset date in 2002 and continued to decline after his date last insured in 2008. (Tr. 30.)

Damron estimated that he was five feet ten inches tall and weighed 354 pounds at the time of the hearing, but weighed 320 pounds in 2009. (Tr. 31.)  He complained of constant pain in his right hip. (Tr. 30.)  In 2009, he could sit through hour-long council meetings and stand for just a few minutes. (Tr. 31-32, 39.)  When standing he had to lean on something because he gets "hot and sweaty, and feel[s] like [he's] going to pass out." (Tr. 31.)  He could walk at a slow pace for no more than ten minutes, and then has to lie down. (Tr. 31-32.)  He could lift twenty pounds with his right arm. (Tr. 32.)  To control his pain, he took medication, including Vicoden, and used a transcutaneous electrical nerve stimulation ("TENS") unit. (Tr. 38.)

Damron reported that he could not cook a meal without becoming dizzy and having to lie down. (Tr. 37.)  He could ride a mower for an hour, but would have to lie down afterwards. (Tr. 37.)  He rode a bicycle until 2007, but would get hot and out of breath. (Tr. 37.)  After showering, he had to lie down for fifteen minutes to "catch his breath" and "get some strength back." (Tr. 38.)

As to his mental health, Damron testified that in 2009 he had at least fifteen "bad days" a month in which he stayed in bed all day. (Tr. 35.)  His bad days started before 2002, but his employer had a liberal attendance policy and he was able to use vacation days, so he was never disciplined for missing work. (Tr. 35.)  Every few weeks, he had difficulty sleeping because of nightmares about his daughter's death in 2002 from an auto accident and his brother's suicide in 1989. (Tr. 35-36.)  He stated that he would rather be dead, but will not commit suicide because

he is afraid of going to hell, which is what he believed happened to his brother.[3] (Tr. 35.)

### B. Medical Evidence Pertaining to Damron's Physical Health

On February 28, 2001, Damron hurt his shoulder while lifting a basket of parts at work. (Tr. 261, 321.) He saw several doctors and was treated with medication, including Vicoden; physical therapy; and injections. (Tr. 261-62, 659.) Damron attempted to return to work in May 2001, but after three days his shoulder pain increased and began radiating to the left side of his neck and down his left arm. (Tr. 262.) After further treatment, including three trigger point injections, Damron's symptoms completely resolved, and he returned to work. (Tr. 326.)

In September 2001, however, Damron's job duties changed and required increased repetitive use of his shoulders, which aggravated his symptoms. (Tr. 326.) He was again placed off work. (Tr. 326.) He began using a TENS unit, which reduced his symptoms by about fifty percent. (Tr. 390.)

On June 14, 2002, Damron returned to work with no restrictions; his condition, however, soon worsened. (Tr. 388.) On October 14, 2002, Dr. Larry Kennedy, Damron's treating specialist, released him to return to medium work (frequent lifting up to twenty-five pounds and occasional lifting up to fifty pounds), but with no repetitive work with the left arm. (Tr. 536.) In light of the restrictions, Dana placed him off work. (Tr. 388.)

In November 2002, after Damron had repeated episodes of chest pain and syncopal or near-syncopal symptoms, Dr. Larry Watkins, Damron's family practitioner, suspected he had Syndrome X, a metabolic disorder. (Tr. 661.) He started Damron on Niaspan and advised him to lose weight. (Tr. 661.)

---

[3] The ALJ found that Damron's symptom testimony was not entirely credible–a finding Damron does not challenge on appeal. (Tr. 13.)

In September 2003, Damron underwent a functional capacity evaluation. (Tr. 346, 502-05.)  He walked one mile in twenty-one minutes, stood thirty minutes with two one-minute breaks due to low back pain, and sat for thirty minutes. (Tr. 503.)  He was unable to tolerate overhead reaching with the left upper extremity due to pain. (Tr. 503.)  The evaluation revealed that Damron could tolerate a "light to medium category of physical demands," which translated to frequently handling up to twenty pounds bilaterally and fifteen pounds in either hand; he was restricted only in his ability to lift or use the left upper extremity above chest height. (Tr. 505.)  Dr. Kennedy signed the functional capacity report, reflecting Damron's "update[d] work restrictions" and that he could return to full-time employment. (Tr. 506-09.)

On February 15, 2004, Damron felt ill after taking Niaspan and went to the emergency room. (Tr. 353.)  He was assessed with chest pain and a history of being released from niacin therapy; he was encouraged to see his primary physician the next day. (Tr. 353.)

On June 3, 2004, Damron went to the emergency room after a syncopal episode with abdominal pain. (Tr. 363.)  By the time of examination, Damron had sustained complete pain relief and was essentially asymptomatic. (Tr. 363.)  The emergency room physician noted that Damron was morbidly obese. (Tr. 362.)  He was diagnosed with orthostatic and vasovagal syncope; and abdominal wall muscle pain, resolved. (Tr. 363.)  He was instructed to visit his doctor the following week, drink plenty of water, and avoid caffeine. (Tr. 363.)

On June 8, 2004, Damron reported to Dr. Watkins that he had experienced several more pre-syncopal episodes after the emergency room visit. (Tr. 731.)  Dr. Watkins suspected that Damron's blood pressure medication, Benicar, was "working too well"; thus, he halved the dosage. (Tr. 731.)  He reminded Damron to lose weight. (Tr. 731.)

On June 24, 2004, Damron reported more near-syncopal spells; Dr. Watkins discontinued the Benicar. (Tr. 731.)  On September 13, 2004, Damron told Dr. Watkins that the syncopal spells had stopped for a time after discontinuing the Benicar, but had recently returned. (Tr. 659.)  They occurred most often when he was up and moving, but at times he felt light-headed when sitting. (Tr. 659.)  He had also experienced chest pain and shortness of breath; Dr. Watkins referred him to a cardiologist. (Tr. 659.)

On October 25, 2004, an MRI of Damron's lumbar spine revealed stable degenerative disc disease at L4-5 and L5-S1, with no evidence of lumbar disc herniation or central spinal stenosis. (Tr. 711.)  Similarly, an MRI of his cervical spine showed a minimal central disc bulge at C5-6, but no evidence of cervical disc herniation or central spinal stenosis. (Tr. 712.)

On November 4, 2009, Dr. Watkins noted Damron's history of hypertension, non-insulin dependent diabetes, and high cholesterol. (Tr. 655.)  Damron reported that he easily becomes short of breath with activity; Dr. Watkins attributed this, at least in part, to Damron's obesity. (Tr. 655.)  His blood pressure was "great" and his labs "decent." (Tr. 655.)  Dr. Watkins scheduled Damron to return in six months. (Tr. 655.)

On March 28, 2010, Damron went to the emergency room due to shortness of breath and substernal chest pressure. (Tr. 680.)  The emergency room physician noted Damron's history of chest discomfort, that past work-ups revealed no cardiac problems, and that he was morbidly obese. (Tr. 680.)  Damron was admitted with a diagnosis of pneumonia. (Tr. 680-704.)  An echocardiogram revealed aortic valve sclerosis without significant stenosis and preserved left ventricular function (Tr. 698), which Dr. Watkins characterized as "a clean bill of health on his heart" (Tr. 722).  Upon discharge, Damron's lungs were clear; he was encouraged to walk to lose

weight and increase his strength. (Tr. 704.)

On May 5, 2010, Dr. Watkins told Damron that "he really needs to get serious about losing weight." (Tr. 722.) He noted that Damron's "huge obesity" makes him short of breath after walking fifty feet. (Tr. 722.)

On March 16, 2011, Dr. Robert Bond, a state agency physician, reviewed Damron's record and concluded that there was insufficient evidence from October 14, 2002, his alleged date of onset, to December 31, 2008, his date last insured, to fully evaluate the severity of his physical impairments. (Tr. 791.) A second state agency physician later affirmed Dr. Bond's opinion. (Tr. 793.)

### C. Medical Evidence Pertaining to Damron's Mental Health

Damron has struggled with depression since his brother's suicide in 1989 followed by his daughter's death in 2002. (Tr. 395.) He tried counseling after his brother's death, but was not honest in the sessions; therefore, it was unsuccessful. (Tr. 395.) He did not seek out counseling after his daughter's death because he felt it would be a "sign of weakness." (Tr. 395.)

On October 13, 2003, Damron gave Dr. Watkins a depression screening form from church that he had completed. (Tr. 660.) Dr. Watkins noted that Damron did not do very well on the form and prescribed Lexapro. (Tr. 660.) Two years later, in September 2005, Dr. Watkins changed Damron's prescription to Wellbutrin after Damron complained of increased anxiety. (Tr. 657.) He was also prescribed Seroquel for insomnia. (Tr. 655.)

For the next two years, Damron did "pretty well" on Wellbutrin. (Tr. 655.) In early 2007, however, he became more agitated and angry; Dr. Watkins switched him to Cymbalta. (Tr. 655.) In March 2007, Damron reported that the Cymbalta was "wonderful for him," as his anger had

disappeared; he stated he did not want to see a psychiatrist. (Tr. 655.)

In March 2010, Kenneth Neville, Ph.D., a state agency psychologist, reviewed Damron's record and concluded that there was insufficient evidence to fully evaluate the severity of his mental impairments from his date of onset in October 2002 through his date last insured in December 2008. (Tr. 664-76.)

On January 31, 2011 (more than two years after his date last insured and one week after he filed his DIB application), Damron was assessed by Suzanne Lenhart, M.A., a licensed mental health counselor.[4] (Tr. 814-19.) He told her he had gained 150 pounds since 1989 and had reoccurring nightmares about his brother's death, blaming himself for the loss. (Tr. 815.) Ms. Lenhart noted that Damron was on Seroquil and used to be on an antidepressant. (Tr. 815.) She documented a diagnosis of post-traumatic stress disorder ("PTSD") and a Global Assessment of Functioning ("GAF") score of fifty.[5] (Tr. 819.) She began weekly therapy sessions with Damron, focusing on his physical health challenges, negative feelings of self-worth, and grief over his deceased brother and daughter. (Tr. 807-08.) Damron denied suicidal ideation but admitted a lack of interest in life; he complained of sporadic sleep. (Tr. 806.) Within two months, Damron told Ms. Lenhart that his antidepressant medications were "working well." (Tr. 811.)

---

[4] Although Damron refers to Ms. Lenhart as a "Dr." and "psychiatrist" in his brief (Opening Br. 3, 11-12), the record reveals that Ms. Lenhart is actually a licensed mental health counselor with an "M.A." degree (Tr. 805-19).

[5] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of forty-one to fifty reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*

On March 8, 2011, J. Gange, Ph.D., a state agency psychologist, reviewed Damron's record and concluded that there was insufficient evidence to fully evaluate the severity of Damron's mental impairments from his date of onset in October 2002, through his date last insured in December 2008. (Tr. 777-89.)  Joseph Pressner, Ph.D., a second state agency psychologist, later affirmed Dr. Gange's opinion. (Tr. 794.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not "reweigh the evidence, resolve conflicts, decide questions of credibility," or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

# IV. ANALYSIS

## A. The Law

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the

---

[6] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On May 16, 2012, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 16-22.) She found at step one that Damron had not engaged in substantial gainful activity through his date last insured; and at step two, that he had the following severe impairments: degenerative disc disease of the cervical and lumbar spine, impairment of the left shoulder with ongoing pain, and obesity. (Tr. 11.) But the ALJ determined at step three that Damron's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 12.)

Before proceeding to step four, the ALJ assigned Damron the following RFC:

[F]rom October 14, 2002, the alleged onset of disability, through September 18, 2003, the claimant had the [RFC] to perform work at the medium exertional level . . . , except that he was unable to do repetitive work with his left arm. From September 19, 2003, until December 31, 2008, the date last insured, . . . the claimant had the [RFC] to perform work at the light and medium exertional levels . . . , except the claimant can frequently handle no more than 20 pounds bilaterally, can frequently handle no more than 15 pounds in either hand, and the claimant is restricted from using the left upper extremity above chest height.

(Tr. 12-13.) Based on this RFC and the vocational expert's testimony, the ALJ concluded at step four that Damron was unable to perform his past work as a machinist. (Tr. 15.) The ALJ then concluded at step five that Damron could perform a significant number of light, unskilled jobs within the national economy. (Tr. 16.) Accordingly, Damron's claim for DIB was denied. (Tr. 16.)

## C. The RFC Assigned by the ALJ Is Supported by Substantial Evidence

To begin, Damron claims that the RFC assigned by the ALJ is not supported by substantial evidence because it does not accommodate his mental health problems. Specifically,

he argues that the RFC is flawed because the ALJ: (1) mischaracterized his mental health treatment history; (2) inappropriately "played doctor" and failed to adequately develop the record; and (3) ignored evidence post-dating his date last insured. (Opening Br. 10-12.) Damron's arguments, however, are unpersuasive.

The RFC is a determination of the tasks a claimant can do despite his limitations. 20 C.F.R. § 404.1545(a)(1). Although an ALJ may decide to adopt the opinions expressed in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ. 20 C.F.R. § 404.1545(e); SSR 96-5p, 1996 WL 374183, at *2 ("[A] medical source statement must not be equated with the administrative finding known as the RFC assessment."). The RFC assessment:

> is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.

SSR 96-5p, 1996 WL 374183, at *5; *see* 20 C.F.R. § 404.1545.

### 1. The ALJ Did Not Ignore or Mischaracterize Damron's Treatment History

First, Damron asserts that the ALJ ignored or mischaracterized his mental health treatment history by stating that he had "no ongoing problems not controlled by medication" and "there was no referral for therapy . . . ." (Tr. 12.) In support of this argument, Damron points to several of Dr. Watkins's notes, contending that they reveal "repeated references to continuing insomnia *despite* medication" and that his medications were "adjusted numerous times over the course of his treatment." (Opening Br. 10 (emphasis in original).) Damron purports that this evidence undercuts the ALJ's characterization that his mental health symptoms were well

controlled by medication.

Contrary to Damron's assertion, these notes support the ALJ's observation that when Damron actually took Seroquel, it effectively treated his insomnia. *See Stevenson*, 105 F.3d at 1155 (acknowledging that an ALJ is entitled to make reasonable inferences from the evidence before him). In that regard, Dr. Watkins wrote in November 2008: "[Damron] currently [is] not on a schedule and sometimes goes three days without sleep and takes a Seroquel to help him sleep at that point. I did encourage him to get on a schedule because I think that would markedly improve his symptoms and his ability to tolerate his meds." (Tr. 651.) Similarly, in May 2009, Dr. Watkins documented: "He is having some trouble with insomnia. And the Seroquel helps that. He hasn't had it for awhile." (Tr. 652.)

Moreover, that Dr. Watkins regularly adjusted Damron's medications does not mean that the medications were ineffective. Indeed, in February 2007, Dr. Watkins prescribed Cymbalta in place of Wellbutrin, which Damron had taken "for a long time" and "done pretty well [on until] recently." (Tr. 655.) The following month, Dr. Watkins confirmed that "Cymbalta has been wonderful for [Damron]. Within three days, his anger disappeared . . . ." (Tr. 655.) And in July 2007, when adjusting Damron's medications to "help with some racing thoughts and some problems he has been having lately with stress," Dr. Watkins wrote that Damron's "overall management is pretty good." (Tr. 654.) Besides, some of Dr. Watkins's adjustments resulted from Damron discontinuing the medications on his own. (*See*, *e.g.*, Tr. 652 ("He unfortunately had to stop his medication because of cost so I went ahead and changed them today to minimize the cost."); Tr. 654 ("Been off all his meds for many, many mo[nth]s. His insurance has dropped to where it pays 10 dollars. . . . He wanted to try something he could get at Wal[]mart for four

dollars.").)

And although Damron asserts that Dr. Watkins "repeatedly discussed referring him to a psychiatrist" (Opening Br. 10 (citing Tr. 654-55)), Damron did not want to go, and Dr. Watkins never did make the referral prior to Damron's date last insured. In fact, in February 2007, Dr. Watkins wrote that he would refer Damron to Dr. Holmes "unless he is feeling perfect" by his next appointment. (Tr. 654.) Two weeks later, Dr. Watkins documented that Cymbalta had been "wonderful" for Damron and his anger had disappeared; accordingly, Dr. Watkins did not make the referral. (Tr. 654.) Therefore, the ALJ's observation that Damron was never referred for mental health therapy prior to his date last insured is accurate.

Thus, contrary to Damron's contention, the ALJ did not ignore or mischaracterize his mental health treatment history.

2. The ALJ Adequately Developed the Record and Did Not "Play Doctor"

Next, Damron argues that the ALJ failed to develop the record and impermissibly "played doctor" by making his own independent medical findings. *See Rohan v. Chater*, 98 F.3d 966, 976 (7th Cir. 1996). Damron's second argument fares no better than his first.

As background, the ALJ found at step two that Damron's psychological difficulties did not constitute a severe impairment prior to his date last insured. (Tr. 12.) In doing so, she observed that Damron's symptoms were well-controlled by medications prescribed by his family physician; he was not referred for counseling prior to his date last insured; and he experienced no more than mild limitations in maintaining social functioning and concentration, persistence, or pace. (Tr. 12.) Later in the decision, the ALJ acknowledged that Damron had a mental impairment–just not a severe one; for that reason, she rejected the March 2010 opinion of Dr.

Neville and the March 2011 opinions of Dr. Gange and Dr. Pressner, the state agency psychologists, who found there was insufficient medical evidence to show *any* mental impairment. (Tr. 15.)

Damron contends that after rejecting the state agency psychologists' opinion, the ALJ inappropriately "played doctor" and made her own independent medical findings, resulting in an RFC that rests on insufficient evidence. But that is not the case, as the ALJ explained that she relied on evidence from Dr. Watkins, Damron's treating family practitioner, who documented that Damron's medication was helpful in alleviating his symptoms and articulated no work-related mental limitations.

In a similar case, *Pepper v. Colvin*, 712 F.3d 351, 358-59 (7th Cir. 2013), the claimant was diagnosed with depression prior to her date last insured, but her symptoms were stable on medication. Upon review, a state agency psychologist concluded that there was insufficient medical information to establish any kind of mentally disabling impairment before her date last insured. *Id.* The ALJ then found the claimant's mental impairment non-severe at step two, citing the absence of psychiatric or mental medical treatment prior to the claimant's date last insured and her good response to medication; later in his sequential analysis, the ALJ concluded that the claimant's depression did not prevent her from performing light work. *Id.* at 366. The Court rejected the claimant's argument that the ALJ was "playing doctor," finding that substantial evidence supported the ALJ's determination. *Id.* at 367. The Court emphasized that the claimant, who was represented by counsel throughout the proceedings, failed to carry her burden of showing that she was disabled as a result of her depression. *Id.* (citing *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004)). Here too, contrary to his assertions that the ALJ "played doctor,"

Damron simply failed to carry his burden of producing evidence of mental limitations prior to his date last insured.

Not to be deterred, Damron urges that the ALJ should have obtained an updated expert opinion about the severity of his mental condition–particularly considering that the 2011 counseling notes from Ms. Lenhart were submitted after the state agency psychologists' review. He purports that by failing to do so, the ALJ did not fulfill her duty to adequately develop the record. *See Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) ("Although a claimant has the burden to prove disability, the ALJ has a duty to develop a full and fair record.").

But Damron overreaches in his assertions. Social Security Ruling 96-6p instructs that an ALJ must obtain an updated opinion from a medical expert "[w]hen additional medical evidence is received that in the opinion of the [ALJ] . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." 1996 WL 374180, at *4. Ms. Lenhart's records, which post-date Damron's date last insured by more than two years, do not provide a basis upon which to change the state agency psychologists' opinion that Damron did not meet or equal a listing prior to his date last insured.

"Records from medical treatment that took place after [the claimant's] last date insured . . . , are relevant only to the degree that they shed light on [his] impairments and disabilities from the relevant insured period." *Million v. Astrue*, 260 F. App'x 918, 921-22 (7th Cir. 2008) (unpublished). Here, Ms. Lenhart's records summarize her counseling sessions with Damron in 2011, which centered on his physical health challenges, negative feelings of self-worth, and grief over the loss of loved ones; the records do not opine retrospectively back to the insured period.

Moreover, Ms. Lenhart did not assign Damron any work-related mental limitations in her documentation. (*See* Tr. 805-19.) For that matter, Damron in his 2010 mental function report wrote that he could pay attention "as long as required" and follow instructions "as well as needed to accomplish the task at hand." (Tr. 158.) He also indicated that he got along "very well" with authority figures, and, although it was not always easy, could adapt to change. (Tr. 158.)

Therefore, Ms. Lenhart's records do not show that Damron's mental impairment met or equaled a listed impairment or that it significantly limited his ability to function during the period relevant to the ALJ's decision. *See Wright v. Astrue*, No. 03-cv-231, 2008 WL 4829950, at *11 (W.D. Wis. Oct. 27, 2008) (articulating that because the physician's opinions post-dated the claimant's date last insured and assessed her current limitations, the opinions were not relevant to the period under scrutiny (citing *Sienkiewicz v. Barnhart*, 409 F.3d 798, 802 (7th Cir. 2005))).

Accordingly, Damron's argument that the ALJ should have obtained an updated expert opinion about the severity of his mental condition is unpersuasive.

### 3. The ALJ Did Not Ignore an "Entire Line of Evidence"

In a related argument, Damron contends that the RFC is flawed due to the ALJ's failure to consider evidence post-dating his date last insured–again, Ms. Lenhart's 2011 counseling records. But to reiterate, the ALJ did not commit reversible error by failing to discuss Ms. Lenhart's documentation.

As a general matter, "[t]he ALJ must evaluate the record fairly. Thus, although the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling. Otherwise it is impossible for a reviewing court to tell

whether the ALJ's decision rests upon substantial evidence." *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (citations omitted); *see also Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).

Here, Ms. Lenhart's documentation does not rise to the level of an entire line of evidence contrary to the ALJ's decision. Her treatment notes are not so different from Dr. Watkins's during the relevant period that they suggest the ALJ would have assessed the severity of Damron's mental problems differently had he explicitly considered Ms. Lenhart's notes. Like Dr. Watkins, Ms. Lenhart documented that Damron's antidepressant medication–when taken–was "working well" to relieve his symptoms (Tr. 811), substantiating the ALJ's observation that Damron's mental health symptoms were "well controlled by medication" (Tr. 12).

And as stated earlier, "[r]ecords from medical treatment that took place after [the claimant's] last date insured, . . . are relevant only to the degree that they shed light on [his] impairments and disabilities from the relevant insured period." *Million*, 260 F. App'x at 921-22; *accord Carlson v. Astrue*, No. 3:06-cv-253, 2009 WL 1513137, at *3 (N.D. Ind. May 27, 2009) (collecting cases). To reiterate, Ms. Lenhart did not offer a retrospective opinion, or for that matter, assign Damron any work-related mental limitations. Thus, her documentation does not shed light on Damron's mental health limitations prior to his date last insured.[7] *See Newell v.*

---

[7] Ms. Lenhart, as a licensed mental health counselor, would be considered an "other source," rather than an "acceptable medical source," under the regulations. SSR 06-03p, 2006 WL 2329939, at*2. Information from an "other source" cannot establish the existence of a medically determinable impairment, but may provide insight into the severity of the impairment and how it affects the claimant's ability to function. *Id*. As to the GAF score of fifty Ms. Lenhart assigned at Damron's initial visit when he was off antidepressants, "GAF scores are more probative for assessing treatment options rather than determining functional capacity and a person's disability." *Curry v. Astrue*, No. 3:09-cv-565, 2010 WL 4537868, at *7 (N.D. Ind. Nov. 2, 2010) (citing *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). Within two months of Damron resuming antidepressants, Ms. Lenhart, like Dr. Watkins, indicated that the medications were "working well." (Tr. 811.)

*Astrue*, 869 F. Supp. 2d 875, 886 (N.D. Ill. 2012) (concluding that even if the ALJ should have discussed the claimant's records post-dating his date last insured, the ALJ's failure to do so was mere harmless error). Therefore, the ALJ's failure to discuss Ms. Lenhart's records does not require a remand of the Commissioner's final decision.

### D. The ALJ Adequately Considered Damron's Obesity

Next, Damron argues that the ALJ erred by failing to properly consider the effect that his obesity has on his other impairments. Contrary to Damron's assertion, the record evidences that the ALJ adequately considered Damron's obesity.

Social Security Ruling 02-1p states that obesity is a "medically determinable impairment and remind[s] adjudicators to consider its effects when evaluating disability." 2000 WL 628049, at *1. It emphasizes that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." *Id*. It also instructs ALJs "to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's [RFC]." *Id*.; *see generally Denton*, 596 F.3d at 423 (articulating that when assigning an RFC, an ALJ must consider the combination of all limitations on the ability to work, whether severe or non-severe); SSR 96-8p, 1996 WL 374184, at *5.

Here, the ALJ did just that. At the onset of her decision, the ALJ explained that she would consider Damron's combination of impairments, both severe and non-severe, in assigning the RFC. (Tr. 10.) Then, at step two she concluded that Damron's obesity was a severe impairment. (Tr. 11.) At step three, the ALJ found that Damron's obesity, singly or combination with his other impairments, did not satisfy a listing, penning an entire paragraph on the matter.

(Tr. 12.)  The ALJ specifically noted that there was "no evidence in the physicians' chart notes or other reports, or in the allegations of the claimant or others, that the claimant's obesity . . . reaches the level of medical equivalence to a listing." (Tr. 12.)

Then, when crafting Damron's RFC, the ALJ again stated that she studied "*all* symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ." (Tr. 13 (emphasis added).)  In particular, the ALJ articulated that she considered Damron's "obesity as a contributing factor in limiting [the] RFC." (Tr. 14.)

Moreover, the ALJ explained that Damron's treating specialist, Dr. Kennedy, opined in October 2002 that Damron could perform work at the medium exertional level, except that he could not do repetitive work with his left arm. (Tr. 14 (citing Tr. 536).)  And the ALJ considered that a September 2003 functional capacity evaluation revealed that Damron could walk a mile in twenty-one minutes and tolerate light to medium exertional work–a finding which Dr. Kennedy later adopted. (Tr. 14 (citing 503, 508).)  Ultimately, the ALJ afforded "considerable weight" to Dr. Kennedy's opinion and assigned Damron an RFC for medium work from October 2002 to September 2003 (with certain left arm restrictions) and light work from September 2003 through December 2008, his date last insured (with certain bilateral handling and reaching restrictions). (Tr. 14.)

The Seventh Circuit Court of Appeals has found a lack of articulation concerning a claimant's obesity harmless where the ALJ adopted restrictions assigned by a physician who was aware of the claimant's obesity. *See Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Although the ALJ did not explicitly address [the claimant's] weight, he specifically predicated

his decision upon the opinions of physicians who did discuss her weight . . . ."); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (affirming the RFC assigned by the ALJ where he "adopted the limitations suggested by the specialists and reviewing doctors, who were aware of [the claimant's] weight").  Here, Dr. Kennedy, whose limitations the ALJ adopted, explicitly discussed Damron's obesity, and thus, any deficit in articulation was harmless. (Tr. 426-27.)

At bottom, the RFC assigned by the ALJ is adequately supported by the medical source opinions, and there is no indication that the ALJ failed to consider the effect that Damron's obesity had on his other impairments prior to his date last insured.  Therefore, Damron's final argument is unavailing, and the Commissioner's decision will be affirmed.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Damron.

SO ORDERED.

Enter for this 14th day of May, 2014.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge